UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 22-cr-102 (JDB) |
| v. : | |
| : | |
| JORDAN BONENBERGER, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jordan Bonenberger to 14 days of intermittent confinement, 36 months of probation, 60 hours of community service, $500 in restitution, and a $10 special assessment.

**I.     Introduction**

Defendant Jordan Bonenberger—a 27-year-old engineer and United States Marine Corps Reserves veteran from Pittsburgh, Pennsylvania, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Defendant Bonenberger pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in a Capitol Building). As explained herein, a sentence of incarceration is appropriate in this case because Bonenberger (1) walked through the chaos on the West Plaza; (2) entered the Capitol building through the Upper West Side doors with other rioters minutes after police had to retreat from that area; (3) despite hearing alarms and observing other indicators he was not allowed in the building, met up with his travel companion and continued to stay in the Capitol; (4) observed police with riot shields and saw tear gas being deployed; and (5) nevertheless continued to penetrate the Capitol to a third floor hallway adjacent to Speaker Pelosi's private office suite.[2]

The Court must also consider that Bonenberger's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Bonenberger's crime support a sentence of 14 days of intermittent confinement in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 53 (Statement of Offense), at 1-3.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] Bonenberger was jointly charged with Melanie Lanham. She pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). She was sentenced on February 9, 2023 to 18 months of probation, $500 in restitution, and a $10 special assessment.

*Defendant Bonenberger's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Jordan Bonenberger traveled with co-defendant Melanie Lanham ("Lanham") to Washington, D.C., from Pennsylvania to attend the "Stop the Steal" rally. After sightseeing and attending the rally, Bonenberger and Lanham walked to the U.S. Capitol.

At approximately 2:38 p.m., Bonenberger entered the Capitol through the Upper West Terrace doors, approximately five minutes after those doors were first breached. *See* "New Capitol Surveillance Footage Shows A Breach By Jan. 6 Rioters From Start To Finish," Buzzfeednews, *available at* www.buzzfeednews.com/article/zoetillman/capitol-footage-police-trump-insurrection-mob (last accessed Feb. 2, 2023). There were no police in the area he entered because they had retreated moments before. *Id.* Below in Image 1 is a still image from surveillance video of Bonenberger entering the Capitol building. Bonenberger, wearing blue jeans, a black jacket, and red ballcap, is circled in red in the image.



**Image 1**

The door was alarmed and went off as the doors were breached. The alarm was still blaring when Bonenberger entered the hallway, which was lined with boxes. He has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so.

Bonenberger walked up the steps to the Rotunda and walked around the Rotunda. He returned down the steps and near the Upper West Terrace doors to wait for Lanham. Lanham entered the Capitol through the same Upper West Terrace doors at approximately 2:44 p.m and climbed the steps to the Rotunda with Bonenberger. The two then walked around the Rotunda, as shown in Image 2.



*Image 2*

Bonenberger and Lanham also walked to other areas of the Capitol, including a corridor on the third floor of the Capitol building containing part of the Office of the Speaker. No other rioters were in the area. The hallway was furnished with desks and other office furniture. Image 3 shows Bonenberger with Lanham in the corridor at approximately 2:55 p.m.



*Image 3*

Bonenberger and Lanham then exited the Capitol through the Upper West Terrace doors at approximately 2:57 p.m., as shown in Image 4 below.



*Image 4*

Bonenberger remained on the Western Exterior steps for several minutes and took photographs with Lanham, as shown in Image 5 below.



*Image 5*

In total, Bonenberger spent approximately 20 minutes inside of the Capitol.

*Defendant's Interview*

On August 9, 2023, Bonenberger was interviewed with his counsel present. He admitted travelling with Melanie Lanham in her car to Washington, D.C. on January 6, 2021, and watching former-President Trump's speech. After the speech concluded, they walked from the Ellipse to the Capitol. Bonenberger claimed that they moved up in the crowd closer to the Capitol because they were curious.

Bonenberger claimed that he noticed a door to the Capitol was being accessed by people moving in and out of the door. Bonenberger acknowledged entering the Capitol and making his way to the Rotunda area. He admitted that he could hear alarms and hearing them led him to question whether he was allowed in the building, suggesting incredibly that even by this time, he wasn't "sure" whether he was allowed in the building.

Bonenberger admitted that after leaving the Rotunda, he and Lanham saw police with riot shields blocking off an area and noticed tear gas had been released inside the building. According to Bonenberger, he told Lanham "this is not good; we need to leave right now." Bonenberger said that as they began to leave, Lanham stated that she needed to go to the restroom. They found an

6

elevator and took it to the third floor. Bonenberger said they found a bathroom door, but it was locked. He said they proceeded down the hallway, saw a sign that said "Office of the Speaker," and took a photo. Bonenberger said they were unable to find a restroom and proceeded down the elevator to the first floor and exited the Capitol the same way they entered. He acknowledged that they stood on the steps on the West side of the Capitol for a while before making their way through the crowd and leaving the area.

During the interview, Bonenberger acknowledged that he and Lanham took photos from the day.

*The Charges and Plea Agreement*

On March 14, 2022, the United States charged Bonenberger by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On March 18, 2022, law enforcement officers arrested him after he voluntarily surrendered to the FBI Pittsburgh Field Office. On March 28, 2022, the United States charged Bonenberger by a four-count Information with those same violations. On April 28, 2023, pursuant to a plea agreement, Bonenberger pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Bonenberger now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v.*

7

*Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days of intermittent confinement.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bonenberger's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Bonenberger, the absence of violent or destructive acts is not a mitigating factor. Had Bonenberger engaged in such conduct, he would have faced additional criminal charges.

Bonenberger made his way to the front of the crowd on the Upper West Terrace, where he saw a group of police near a door. Nevertheless, he made entry through the non-public, alarmed entrance lined with boxes a few minutes after police had to retreat from the area. Thus, he took advantage of the opportunity presented by the mob, and unlawfully entered the building. Moreover, as a member of the United States Marine Corps Reserves, he knew or should have known how his participation in a violent riot in which police were vastly outnumbered placed those officers and others at risk of serious injury or worse.

When inside the Capitol, Bonenberger made his way to the Rotunda area and rather than exit the building immediately, he reunited with Lanham and they both then traveled to the Rotunda and explored other areas of the Capitol. In particular, they went to the third floor—an area where very few rioters traveled—and explored part of the Office of the Speaker in a secluded corridor. In total, he remained inside for approximately 20 minutes.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days of intermittent confinement in this matter.

### B. The History and Characteristics of Bonenberger

Bonenberger has no criminal history and has been compliant with his conditions of pre-trial release.

Bonenberger enlisted in the United States Marine Corps Reserves in 2019 and separated under an Honorable Conditions Discharge in March 2022. PSR ¶ 78. Bonenberger's military service deserves praise, but it is troubling that despite his oath and military training, he still chose to participate in the Capitol riot—an event that threatened the Constitutional principles he swore an oath to protect and defend. His military status is thus a "double-edged sword" that has aggravating as well as mitigating effects on the sentencing calculus.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Bonenberger's actions on January 6, 2021 demonstrate the need for specific deterrence for this defendant. He betrayed his military oath and invaded the Capitol despite knowing that he was breaking the law. Thus, the United States recommends a short sentence of incarceration to prevent Bonenberger from ever again breaking the law in pursuit of his political goals.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Bonenberger based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Bonenberger has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

11

§ 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider sentences of Capitol breach defendants who spent time in sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in central, more public spaces, such as the Rotunda. In this case, Bonenberger traveled to the third floor of the Capitol building where many staff offices are located. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people.

To that end, while no previously sentenced case contains the same balance of aggravating and mitigating factors present here, *United States v. Thomas Fassell,* 21-cr-692 (CKK), provides a suitable comparison to the relevant sentencing considerations in this case. Although Fassell made statements after January 6 showing pride rather than remorse or contrition and spent a longer period of time in the Capitol, other facts of his case resemble Bonenberger's. Both entered the Capitol from the West Plaza and ultimately traveled to Speaker Pelosi's office suite. Judge Kollar-Kotelly sentenced Fassell to 12 months of probation with 14 days of intermittent incarceration.

In another comparable case, *United States v. Nicholas Perretta and Mitchell Paul Vukich,* 21-CR-00539 (TSC), the defendants also traveled to the third floor of the Capitol building. Unlike

12

Bonenberger, Perretta and Vukich witnessed an assault and took papers from off the floor of the hallways. However, they were in more public areas near the gallery rather than the more private hallway where Bonenberger and Lanham were. Judge Chutkan sentenced them each to 30 days of incarceration. .

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.      **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

13

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bonenberger must pay $500 in restitution, which reflects in part the role Bonenberger played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of April 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Bonenberger's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 109.

## VI.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days of intermittent confinement, 36 months of probation, 60 hours of community service, $500 in restitution and a

---

against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

$10 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:    s/ *Sarah W. Rocha*
        SARAH W. ROCHA
        Trial Attorney
        D.C. Bar No. 977497
        219 S. Dearborn Street, Fifth Floor
        Chicago, Illinois 60604
        Telephone: 202-330-1735
        sarah.wilsonrocha@usdoj.gov